Good morning, Your Honors. May it please the court, my name is David Hagegi. I am counsel for petitioner Mrs. Erna Seri Dewi. Your Honors, substantial evidence does not support the agency's denial of Ms. Dewi's asylum application. Instead, the record in this case compels a finding that Ms. Dewi suffered persecution by anti-Chinese, anti-Christian extremists, and that she has a well-founded fear to return to Indonesia. In the alternative, if the decision of the agency is not reversed, petitioner respectfully continues with her request for remand in order to allow the agency to revisit the question of petitioner's membership in not only one, but now two disfavored groups. In light of Tampa Boolan. We have identified four errors that were committed below by the immigration judge, affirmed by the agency, and are currently before the court. The first and most critical error occurred when the agency found that the vicious sexual assault Ms. Dewi suffered was purely criminal in nature, and that her status as a member of two despised minority groups was not one central reason for the attack upon her. Let me ask about that, at least insofar as the Christian aspect is concerned. As I understand the facts, they didn't say anything about, they attacked her before they found her Bible. Right. So given her immutable characteristics, given the country conditions report, the country conditions reports at the time, they were specifically allowed to, they specifically allowed themselves to choose her. When they went up to her, they opened up her purse, they found the Bible. At that point, they called her a china, which is a very derogatory word towards the Chinese. And they questioned her, what is this, referring to her Bible, then saying, trash it. Instead, replace it with a Quran. And then at that point, they dragged her off into an isolated place and started the attack. Now, the government relied, both in their briefs and also in their letter of supplemental authority, the Parisimova case. In that case, actually, the court held that a protected ground is a central reason where it either caused the assailants to initiate their attack or increase its severity once it had begun. And in Parisimova, the court denied relief because they said, look, there were three different areas that Parisimova would have been targeted, either her ethnicity, her association with the American company, or she was a woman who was vulnerable in the wrong place at the wrong time. However, the difference in this case, the facts versus Parisimova, is that here she was at the outset selected because of her ethnicity. And then it also increased as it enraged the men when they found her Bible. And they actually started tearing her Bible. So it shows, it plainly, clearly shows their animosity towards not only her religion, but also, excuse me, not only her ethnicity, but also her religion. In the Parisimova case, they first dragged her into a secluded area, the entryway of the building. And then the very first words out of their mouths was hostile words against her herbal life. And they said, you shouldn't be working for an American company. And then in the passing, they called her a Russian pig. And their last act was that they tried to rape her. So your analysis under the one central reason, under the Real ID Act, is that it may have started out as perhaps criminal in nature, but it really escalated. Because, of course, then once they found out the Bible in the purse, then the racial slur, and then there was a subsequent assault, correct? Well, I'm not giving up on the fact that they initially selected her as being Chinese. Because if she weren't Chinese, I don't think that this would have happened. But yes, even if initially- Well, you'd have a tough time under a current president. If that's all that happens, I think you'd have a pretty tough time to demonstrate that it rose to the level of persecution, I think. Well, under Persimova, that's what the court decided, as long as it's one central reason. Well, the act itself. I mean, the confrontation. Either the selection, right? Well, the selection, you can't possibly contend that just singling her out constitutes persecution. Let me address that. So it's, as you contend, it appears to be singling her out for the assault, and then it escalates, according to your argument, into what appears to be, as you argue, a sexual assault. The punishment. Right. So maybe if you take those two together, it might rise to the level of, quote unquote, persecution. But you have to, that's a different question than whether it's on account of, or one of the central reasons. Well, Your Honor, let me try to say it a little bit differently. And that's really my point. Crimes happen all the time. So the fact that she was essentially targeted for commission of a crime doesn't show that she was persecuted on a protected ground. But I think what you're saying is you have better facts than that. Because once the crime began, and that's why I said it might have started out as a criminal in nature, once they found her Bible, then there was an ethnic slur and a comment about replacing the Quran. And then the assault continued. Yes, Your Honor. That's my position. Yes. And I'd like to reserve two minutes. Yeah, let me ask you one question about your alternative request. Wasn't it clear under Wachery that Chinese Christians were a disfavored group? It was clear under Sayal and under Wachery. However, there was another panel decision, Halim, that said, look, these guys are disfavored, but they're not as disfavored as the court suggests in Sayal. Because in Sayal, the court almost went up to the level of systematic persecution, but they held back. They said, look, we're not going to say that mere membership is enough in this disfavored group. You've got to show us that something happened to you as well. Didn't the BIA consider her as a member of a disfavored group? And then it becomes a question whether it's one or two disfavored groups. The angel's on the head of the pen question. Right. And Your Honor, that's where this Halim case comes in, where they balance the facts. And they say, OK, is this more of a Sayal? Because Sayal never experienced any personal harm. Sayal's car was vandalized. I'm sorry, I've cut your time. I'm sorry, I didn't realize that the cut really cut your reply time. Sorry. You go ahead and finish answering Judge Motz's question. Thank you, Judge Motz. In Sayal, she lived in a boarding house. And the local people would come, and they say we don't want Chinese in our neighborhood. Her car was vandalized repeatedly. And during the May 98 riots, the anti-Chinese riots, she hid in the backseat of a cab. Here we have a situation where we've got a lady that was physically assaulted. And there were racial slurs used. There were the fact that they found her Bible, tore it up, told her she needs to replace it. So there was a physical aspect to this that in Sayal just there wasn't. And it just depends on the court which way they want to balance. Is this Halim, or is this Sayal? And I think her facts are stronger than both of those. OK, I'll give you a minute for rebuttal. Well, let's hear from the government. Thank you, Judge. Good morning, Your Honors. May it please the court. Edith Yacon on behalf of the respondent attorney general. This court should deny the petition for review as substantial evidence supports the agency's denial of asylum, withholding of removal, and protection under CAD. Ms. Dewey's claim revolves around childhood discrimination and bullying. She described one incident when she was 10 years old in which a native Indonesian had crashed into her bicycle. Assuming all that to be true, the real incident is the last incident. I'm sorry? Assuming all that to be true about bullying as a child, the real incident is the last incident when she was accosted. There was one adulthood incident in 2002 when she indicated that she was walking home from church around noon when five dark-skinned individuals wearing pesis, or Muslim hats, approached her and held her at knife point. And when they couldn't find anything in her bag, they found a Bible, disparaged it with comments against the Bible and for the Quran. And she indicates, I quote, because they did not find anything, they threw her into a corner and began to assault her before a passerby intervened. And she argued in her brief that the ethnic background of the attackers, the racial slur they used was sufficient to demonstrate a nexus between the harm she suffered and a protected ground, citing Sinha, which is a pre-real-IDIAC case. And of course, this is- I'm not sure it's material unless it has to do with the initial perception of the attackers. Her clothing, it was modest but tight-fitting. Is that basically what one is supposed to infer from the- The police had indicated to her that she shouldn't be  And so the inference is, and she said it was modest, so the inference is it was both modest and tight-fitting. She had indicated that she was wearing tight-fitting clothing but it wasn't clear exactly how modest it was. But in either case- I thought your brief referred to modesty. I thought in your brief, maybe I misread it. I thought she was, she said she was modestly dressed, but it doesn't matter. It's absolutely immaterial unless it pertains to the perception of the attackers. Your Honors, the issue here is whether the REAL-ID Act standard supports the conclusion of the agency, and it does. Under pre-REAL-ID Act law, it's certainly true that an ethnic or racial slur might be sufficient to demonstrate a nexus between such harm and a protected ground. But in Parsimova, this Court addressed the changes in the law affected by Congress through the REAL-ID Act, and one of those changes relates to the nexus determination. And no longer does this, at least in part, standard which was determined by the Court prior to the REAL-ID Act apply. And instead, Congress has legislated that one central reason for the harm be a protected ground. Parsimova- The BIA didn't have the benefit of our opinion in Tampa-Boulogne, if I'm probably completely mangling that pronunciation. But why shouldn't we consider remand for the BIA to take another look at the disfavored group analysis? Tampa-Boulogne certainly doesn't change the result in this case, because the agency addressed the disfavored group analysis and said, even if Ms. Dewey was a member of a disfavored group, she's failed to give- But they look at it in terms of her ethnic background. I'm sorry? They limited it to her ethnic background. They did not, in fact. They indicated that even if she were a member of a disfavored group, without indicating which disfavored group- Well, don't you think it makes a difference? It makes a difference, but when we look at this case as compared to the facts in Sayal and Halim, this case is much more like Halim than it is in Sayal. Their argument is, just with respect to that, this particular issue of Tam- Tam-Bouboulan. Tam-Bouboulan. However it's pronounced. Tam-Bouboulan. Their argument, the petitioner's argument, as I understand it, is that there are two favored, two disfavored groups in play here. Not one, but two. In Halim, the court has indicated that ethnic Chinese are no longer severely disfavored. And even if she's a member of a disfavored group- Are there two or one groups? Is a Chinese Christian one group or two groups? Could arguably be two groups. You could be ethnically Chinese, you could be Christian, or you could be both. Let's say that it's two groups. In either case, under the court's case law, analyzing what it means to demonstrate eligibility for asylum under the disfavored group analysis, it's not enough to be a member of a disfavored group. And that's exactly what the court said in the second low-law decision. So you have to adduce a sufficient individualized risk. When we went through the whole analysis in WACRI, you can't just be a member of a disfavored group. You have to show something more. Exactly. For example, it makes it easier if, for example, you had a Christian and somebody who was a minister out proselytizing, that's an easier case. And admittedly, she doesn't fit within that kind of case. But the incident, the last incident that's in play here, when she's confronted and they're rifling through her purse and they find her Bible and they pull it out. And I can't remember if they tore it up or whatever, but they then tell her, well, get rid of this and use the Quran. I mean, that's pretty, I mean, it's pretty insignificant. There's one question as to whether the harm she suffered was on account of a protected ground. And there's another question, this is the Tompabolan question that you're raising, is whether she has adduced sufficient individualized risk to demonstrate that as a member of a disfavored group, she has a well-founded fear of future persecution. And if one looks at the facts of Sayal and one looks at the facts of Halim, certainly under the court's case law, Halim, this case is not materially distinguishable. Halim suffered incidents of harm, which could arguably have said to have been even worse than the incidents described in this case. There's no need to compare and analyze them tit for tat, but Halim had indicated that he was stripped naked by students in junior high school, spat upon by native Indonesians in high school, refused treatment at a hospital, arrested and detained by police who claimed that they found drugs in his car, and beaten by a mob of riders in May, 1998. And this court upheld the agency's determination that he failed to demonstrate either past persecution or well-founded fear under the disfavored group analysis. It's hard to say that the facts of that case are materially distinguishable from the facts of this case. And when you compare the two, I would also say that the facts of Sayal's case were quite severe. There were native Indonesians who were throwing stones at her boarding house, slashing the tires of her car, scrawling ethnic slurs on her car. There were incidents when she was intimidated personally, and this is distinguishable. Of course, there was this 2002 incident that Ms. Dewi testified to, but I would argue that the facts of Halim are analogous to this case, and Halim really does control, and temptable, and simply doesn't change the result because the agency considered the disfavored group analysis, and determined that even under that analysis. Is it your view that mixed motive analysis no longer applies after the real idea? It applies as set out in the Parsimova decision. In Parsimova, the court realized that there could still be mixed motives for an attack. Of course, mixed motive analysis still applies. Do you think it fits within mixed motive analysis? It fits within the mixed motive analysis to the extent that there could be more than one motivation for an attack. But both motivations were because she was a member of a disfavored group. The first, because she was Chinese. Secondly, because she was Christian. With her record. I mean, as I understand the record, I mean, I think her skin distinguished her from the color of her skin distinguished her from other Indonesians. There is no record evidence to indicate that she was selected for any one particular reason. Of course, we know what the attackers said to her once they found her, stopped her, held a knife to her throat. You're right, you're right. In either case, though, under Parsimova and under the court's case law, the question is not whether the record supports the conclusion the petitioner claims it supports, but whether it compels the conclusion the petitioner claims it supports. I don't want to turn this into a grammar classroom, but I'm thinking about the BIA. It said disfavored group, but clearly considered she was a member of disfavored group. Should it be remanded to say member of disfavored groups? To clarify whether it was one or two groups, or could it be analyzed that the BIA realized she was a member of two disfavored groups and simply said that as a member of either, you know, when it said a disfavored group, it meant either one. I mean, I don't know, I don't know what it meant. It's certainly true that grammatically they used the singular form of group. But maybe grammatically that was correct. In either case, the remand would be futile to the extent that Tampabolan should be considered because the result would be the same. Reading the court's- Futility is something which district judges think courts of appeals don't often care about. Reading the court's decisions in Kotash, which presented the disfavored group analysis and subsequent case law, applying it to Chinese-Indonesians, Christian-Indonesians, and Chinese-Christian-Indonesians. Your honors, this is not a new fact scenario. So of course, Tampabolan reached a new conclusion, which is that Christians are disfavored in Indonesia, but the court has analyzed Chinese-Christian cases on numerous occasions. And by reviewing that case law, by analyzing it in accordance with the facts of this case, your honors, the argument the government presents is that remand would be futile if the court reads the board's decision to indicate that it was considering only one disfavored group and not disfavored groups. I'm not sure that I understand her response. And I can, of course, as a proposing counsel, she could return to Indonesia to areas where there's majority Chinese or Chinese-Christians, couldn't she? And I take it her response is that it's more dangerous there because it's easy then for people who wanna discriminate against her or persecute her to find her. Is that basically what the issue is there? The immigration judge had indicated that Ms. Dewey could relocate, but the board didn't reach that determination. Instead, the board- That's only the IJ. The board had focused instead on the fact that Ms. Dewey had stayed in Indonesia for three years after the harm she suffered in 2002. And the IJ had pointed out, in fact, that during those three years, she left to the Netherlands with a tourist visa and she came back without applying for asylum. And the immigration judge found that to be significant. Although the board didn't reach that, the board did focus on the fact that she stayed in Indonesia for three years and there was no evidence proffered of the fact that her siblings were similarly situated, might have suffered any harm. She has four brothers and sisters who remain in Indonesia. And those facts have been found significant by this court in other cases addressing similar fact patterns. And for those reasons, the substantial evidence supports the agency's denial of relief and protection in this case. Thank you, counsel. We'll hear from- There was a minute for rebuttal. If I ask you a question, you will. In fact, I'll take 30 seconds of it. Yes. I don't have- Okay. Let's address the police really fast because there is no question in my mind, at least. I'm sorry. There is no question that sexual abuse is persecution. The court in Lopez Galarza said the effects of rape are similar to the effects of- There wasn't actually a rape here, but there was- No, because she got lucky. Someone stopped her. But when she went to the police, the police said that it was her skin that was appeasing towards, the color of her skin was appeasing towards her assailants. And she shouldn't wear skin type clothing. However, when asked whether or not she was questioned or she told the police what she was wearing, she never said that. So even the police who are supposed to be protecting her, they turned a blind eye. And this is where we go back to the beginning. And I say to you, look, as a disenfranchised, as a dehumanized and an unprotected object of hatred and resentment in Indonesia, she could be abused without repercussions. And which leaves her vulnerable to attack and her attacker's immune from prosecution. So really, again, getting back to the, sorry, I just went out. I often don't have a train of thought, so I can't lose it. Let me rest there. I lost my train of thought. Unless your honors have any questions. I'll stop that. We understand your argument that you made in your opening presentation. Thank you. Thank you, counsel. We appreciate your argument. And the matter is submitted in.
judges: Motz, Paez, Nguyen